UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| CHARLES G. KINSER | ) |
| | ) |
| Plaintiff, | ) |
| | ) 1:10-CV-312 |
| v. | ) |
| | ) Collier/Lee |
| BECHTEL POWER CORPORATION and | ) |
| SUN TECHNICAL SERVICES, INC., | ) |
| | ) |
| Defendants. | ) |

## **M E M O R A N D U M**

Before the Court are motions for summary judgment filed by Defendants Bechtel Power Corporation and Sun Technical Services, Inc. ("Bechtel" and "Sun Technical" respectively; collectively "Defendants") (Court File Nos. 44 & 46). Plaintiff Charles G. Kinser ("Plaintiff") responded (Court File No. 49), and Bechtel replied (Court File No. 50). For the following reasons, the Court will **GRANT** the motions for summary judgment (Court File Nos. 44 & 46) and **DISMISS** the case.

## **I. FACTS AND PROCEDURAL HISTORY**

The underlying facts giving rise to this case were stated in the Court's earlier Memorandum and Order granting in part Defendants' motions to dismiss and for judgment on the pleadings (Court File No. 30), and will not be repeated at length here. Briefly, the action concerns Defendants' allegedly wrongful conduct following their termination of Plaintiff's employment. Plaintiff has worked in the nuclear industry for over two decades. In the spring of 2008, he was employed by Sun Technical to work on a project at the Watts Bar nuclear facility, which is operated by the Tennessee

Valley Authority ("TVA").[1] At some point during Plaintiff's employment, Bechtel conducted an investigation into employees' living allowances. Bechtel, apparently believing Plaintiff had provided false information about his living expenses, fired him on May 28, 2009. Plaintiff was told he was "being released due to an ongoing investigation by the [Inspector General's] office" (Court File No. 45-1, p. 27 ["Plaintiff's Dep."]). According to Plaintiff, at some point after he was terminated, Defendants "reported in writing to persons maintaining Plaintiff's security clearances, including TVA, that Plaintiff had provided false information to his employer in order to obtain a living allowance certification" (Court File No. 20, ¶ 10 ["Amended Complaint"]). These reports allegedly resulted in Plaintiff's nuclear security clearances being revoked, making him ineligible to be hired by other potential employers in the nuclear industry. According to Plaintiff, these reports were false. Consequently, Plaintiff sued Defendants for defamation, intentional interference with business relationships ("IIBR"), and civil conspiracy.

Plaintiff's lawsuit was filed on November 22, 2010, which is almost eighteen months after he was fired by Defendants. All of Plaintiff's claims are subject to a one-year statute of limitations. Hence, Defendants filed motions to dismiss for untimeliness.[2] Plaintiff's response was twofold. First, he relied on his initial complaint's conspicuous omission of any dates related to the alleged defamation – and his erroneous belief that he had no obligation to specify such dates – to conclude untimeliness could not be established. Second, and more plausibly, he amended his complaint to

---

[1] Sun Technical was a subcontractor for Bechtel, which is a prime contractor with TVA on the Watts Bar project.

[2] More precisely, Sun Technical filed a motion to dismiss (Court File No. 8), while Bechtel filed a motion for judgment on the pleadings (Court File No. 13). The motions were, for all intents and purposes, identical.

allege that regardless of when Defendant's libelous conduct *occurred*, he did not *discover* libelous communications had been made until one year, to the day, before filing suit.[2] The Court granted Defendants' motions in part, dismissing the IIBR claim for failing to allege sufficient facts. With regard to the remaining claims, the Court set a hearing on the single issue of whether Plaintiff's defamation and civil conspiracy claims are time-barred.

The main issue at the hearing, and in a round of post-hearing briefing, concerned whether and to what extent Tennessee's so-called "discovery rule" statute-of-limitations exception applies in libel cases. In a nutshell, if the discovery rule does not apply to libel cases, Plaintiff's case would be untimely; if it does, Plaintiff's case *might* be timely, depending on whether he satisfies the conditions of the discovery rule. In a written memorandum and order entered June 29, 2011, the Court concluded Tennessee's discovery rule may apply in exceptionally rare instances where the "secretive or inherently undiscoverable" nature of a libelous publication prevents a plaintiff from knowing or discovering through use of reasonable diligence he had been defamed. *See Leedom v. Bell*, 1997 WL 671918, *7 (Tenn. Ct. App. Oct. 29, 1997); *Watson v. Fogolin*, 2010 WL 1293797, *4 (Tenn. Ct. App., Apr. 1, 2010). Unfortunately, this legal conclusion was insufficient to allow the Court to rule on the timeliness of Plaintiff's claims. As the Court explained:

> The upshot . . . is this: as a theoretical matter, the discovery rule may apply in libel actions; as a practical matter, it rarely does. This presents a difficulty for the Court at the dismissal stage, for the Court must essentially determine whether a complaint pleads a claim that is "plausible on its face" when it relies upon a doctrine that is hardly ever applicable, that is to say, a doctrine whose invocation is typically *implausible*. This difficulty is amplified by the discovery rule's contingency on non-empirical facts (unlike the typical statute-of-limitations dispute), namely, whether

---

[2]This suit was actually filed 367 days after Plaintiff allegedly discovered libelous publications had been made; however, since days 365 and 366 were weekend days, the 367th day is counted as the last day of the one-year limitations period.

3

> libelous documents were "inherently undiscoverable" and whether, regardless of the date of actual discovery, a plaintiff *could* have earlier discovered the defamation with reasonable diligence.

(Court File No. 39, pp. 3-4). Accordingly, the Court stayed the motions to dismiss and ordered a period of limited discovery to focus exclusively on the questions of: 1) when *in fact* Plaintiff discovered he had possibly been defamed via libelous publications; and 2) when, with *reasonable diligence*, Plaintiff *could have* discovered he had been defamed. The facts which follow emerged from this period of discovery.

Plaintiff has worked in the nuclear industry for over twenty years, at approximately eight different nuclear facilities. In order to get onto a nuclear facility, one needs a security clearance (Plaintiff's Dep. p. 10). To get and hold such a clearance, in Plaintiff's words, "[t]here's a certain lifestyle you have to maintain . . . [y]ou can't have felonies, no DUI's . . . nothing like that. There's a certain standard you have to live to and live by . . . [you must be] trustworthy" (*id*. at pp. 10-11). In addition to site-specific security clearances, there is a nationwide computer database called "Plant Access Data System," or "PADS," which all nuclear facilities in the country use to track and share information related to security restrictions associated with individuals in the nuclear industry. According to Plaintiff's understanding, facilities use PADS to determine if there are any security restrictions which should prevent a prospective employee from being cleared to access the facility (*id*. at p. 12). Based on his lengthy experience in the nuclear industry, Plaintiff knew that if an employee working at a nuclear facility were to be fired for some type of fraud, "it would probably affect their clearance" because "fraud is a serious offense" (Plaintiff's Dep. p. 29).[3] At deposition,

---

[3] Likewise, Plaintiff answered "yes" to the question "Based upon your 25 years' experience in the industry, in the nuclear industry, do issues related to honesty and trustworthiness and so on affect one's ability to gain clearance?" (Plaintiff's Dep. p. 29).

4

Plaintiff was "not surprised" at the notion a coworker had his security clearance revoked for falsifying information on his resume, because "that would be lying" (*id*. at p. 32).

When Plaintiff began his employment for Defendants at the Watts Bar location, he signed a form acknowledging Defendants would use PADS to access information about him and share information about him with others in the nuclear industry.[4] Additionally, Plaintiff expressly "authorize[d] any . . . entity that now has, or obtains in the future, access-related information about me . . ., whether or not such information is included in the PADS database, to release any such information in order to perform the investigation and evaluation required for unescorted access," and further "authorize[d] the entry into the PADS computer database any information collected for the purpose of . . . continued maintenance [of my application]" (Court File No. 45-2, p. 3). Finally, Plaintiff signed to acknowledge his understanding that, "upon my written request to Bechtel, and at no cost to me, I will be provided, within 10 working days, with a printed copy of the information about me which is recorded in the database. If, after my review of such information, I can show that any of the information is incorrect or incomplete, such information will be corrected . . . as soon as is reasonably practical" (*id*.).

In March 2009 Plaintiff learned Bechtel was investigating the living allowances he had been claiming (*id*. at p. 35). On May 28, 2009, Plaintiff was summoned to a meeting involving himself, a Bechtel Human Resources representative, and Michael Lively, an "employee concerns"

---

[4]"I understand that the domestic commercial nuclear power industry uses . . . [PADS], to share information necessary to process applications of workers for unescorted access to nuclear power plants. . . . I understand that the information may be transferred, electronically or otherwise, to other [nuclear power reactor] licensees and contractor/vendors or the agents of each. This information will include, but is not limited to: . . . [d]ates when unescorted access has been authorized or terminated" (Court File No. 45-2, p. 3).

5

professional for Bechtel. At the meeting, Mr. Lively told Plaintiff he was being terminated immediately "due to an ongoing investigation by the [Inspector General's] office . . . [into] a living allowance fraud" (*id.* at p. 27). At the time, it was "clear to [Plaintiff] . . . that the reason [his] employment was coming to an end was related to th[e] living allowance issue" (*id.* at p. 37). At the conclusion of the meeting, Plaintiff's badge to access the Watt's Bar plant was taken away (*id.* at p. 23).

In the months that followed, Plaintiff "had a suspicion" information might have been conveyed to TVA which was negatively affecting his nuclear security clearance (*id.* at pp. 22-23). During the summer of 2009 Plaintiff applied for roughly a dozen jobs, but "was getting no response" (*id.* at p. 23). This was quite unusual for Plaintiff. In the past he had always had no trouble getting a job at a nuclear facility when he wanted one – "If I needed a job or wanted to go to a certain job, for years I'd submit a resume. And if I want to go there, accept the pay or whatever it is, it was always kind of automatic" (*id.* at p. 24). As early as July 2009, Plaintiff was concerned there might be a flag on his name in PADS.[5] Then, in August 2009, a prospective employer finally got back to Plaintiff instead of rejecting him without explanation, and alerted Plaintiff "that he had checked PADS, and there was definitely something out there . . . a restriction out there in PADS" (*id.* at p.

---

[5] Q: Back in July of 2009, when you called Bechtel, it sounds like you were concerned enough about this to call Bechtel about it; is that fair to say?
A: Yes.
Q: And you were concerned in July of 2009 that there could be a flag in PADS about you; is that right?
A: Could be. (Plaintiff's Dep. pp. 44-45).

6

25).[6] Plaintiff knew the "flag" must be related to his May 2009 termination, since he had never had any other adverse employment situations.[7]

Subsequently, Plaintiff attempted to find out more information about the "flag" on his record in PADS, and to remedy the situation. On November 13, 2009, Plaintiff sent an e-mail to Charles Woodle, a TVA official. In this e-mail, Plaintiff stated "[l]ast week I was advised by a potential employer that THERE IS something popping up on my security file. . . . It has been 5 ½ months since I was 'released due to an ongoing investigation.' And I cannot get any answers today. . . . How can Bechtel RUIN me without telling me WHY?" (Court File No. 45-5). Again, "[Plaintiff] understood on November 13th that whatever this was that was popping up [on his security file] . . . was something related to [his] termination on May 28th" (Plaintiff's Dep. p. 50).

One week later, on November 20, 2009, Plaintiff allegedly received from TVA a misaddressed letter originally sent to him on August 5, 2009. This letter informed Plaintiff "that

---

[6]An internal Bechtel e-mail indicates Plaintiff spoke with a Bechtel representative in early July 2009 to inquire about "the flag in PADS" (Court File No. 45-4, p. 1). However, Plaintiff contends this document is hearsay and does not satisfy the business records exception. Because this document is not essential to the Court's disposition of the case, and resolving the dispute might require a hearing on the nature of Defendants' keeping of business records, the Court disregards this document.

[7]   Q: And as you understood it, that flag was related to your previous
     employment at Watts Bar?
     A: Yes.
     Q: Okay. Because you had never been fired before by any other nuclear employer;
     right?
     A: No.
     Q: Never been convicted of any crime or pulled over for DUI or anything like that?
     A: No.
     Q: And so it's fair to say in August of 2009 the only reason a flag could have been
     in PADS, to your knowledge, related to these events in May of 2009?
     [Plaintiff's Counsel]: Object to the form.
     A: Yes. (Plaintiff's Dep. p. 45).

7

your unescorted access authorization was denied on July 31, 2009 due to providing false information to your employer in order to obtain a living allowance certification" (Court File No. 48-3, p. 2). One year, to the day, after allegedly receiving this letter, Plaintiff filed the instant lawsuit.

**II.     STANDARD OF REVIEW**

Summary judgment is proper if the movant shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, but must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty*

8

*Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

### III.    ANALYSIS

After reviewing the parties' briefs and evidence, the Court concludes more than a year before filing this action Plaintiff either knew, or could have discovered through the use of reasonable diligence, sufficient information that would put him on notice of a possible defamation claim against Defendants.[8]  Accordingly, the discovery rule does not save Plaintiff's case from the statute of limitations, and the Court will dismiss the case as untimely brought.

Ample, uncontroverted evidence shows Defendant knew there was a "flag" on his PADS security file well before his purported "discovery" date of November 20, 2009.  Even ignoring the contested July 2009 internal Bechtel e-mail, Plaintiff clearly knew of the "flag" by August 2009, when a prospective employer told him "there was definitely something out there . . . a restriction out there in PADS" (Plaintiff's Dep. p. 25).  And even ignoring *this* evidence, Plaintiff's November 13, 2009 e-mail, stating "[l]ast week I was advised by a potential employer that THERE IS something popping up on my security file" indicates that, at the very least, he knew there was a "flag" on his security file over a week before November 20, 2009.  Not only did Plaintiff know there was a "flag" on his PADS security file, he understood it was related to his May 28, 2009 termination – indeed, it was "the only reason a flag could have been in PADS" (*id*. at p. 45).

In his summary judgment brief, Plaintiff does not deny he discovered there was a "flag" in

---

[8]The Court says "possible defamation claim" simply because the Court takes no view as to whether Plaintiff's defamation claim stands any chance of success on the merits.

9

PADS prior to November 20, 2009, or that he understood it was related to his May 2009 termination. Rather, Plaintiff claims "he did not know anything about the content of those communications [by Defendants to TVA]" which resulted in the "flag" being placed (Court File No. 49, pp. 5-6 ["Plaintiff's Brief"]); that is, he did not know Defendants had represented to TVA he had "provid[ed] false information to your employer in order to obtain a living allowance certification," as the letter allegedly received from TVA on November 20, 2009 stated (Court File No. 48-3, p. 2). According to Plaintiff, prior to receiving the letter, he knew he had been terminated "due to an ongoing investigation" into living allowance fraud, but he had no idea *he* was suspected of engaging in living allowance fraud. As best the Court can understand it, Plaintiff thought his termination was somehow "collateral damage" of the investigation, free of any unfavorable implication he himself had engaged in living allowance fraud or related wrongful conduct. It was not until he received the letter on November 20, 2009 that he finally deduced the flag on his PADS file – which he had known for months had been placed there as a result of his termination by Defendants for reasons relating to living allowance fraud – was there because Defendants thought *he* had committed it.

The Court finds this position incredible, as would any reasonable juror. The distinction between an employee being fired because of "an ongoing investigation" into living allowance fraud and because he is thought to have committed such fraud is one in search of a difference. As early as March 2009, Plaintiff knew Bechtel was investigating his claimed living allowances. When he was called into a meeting with human resources personnel on May 28, 2009 and told he was being terminated because of an "ongoing investigation" into living allowance fraud there could be only one reasonable conclusion: Defendants believed he had committed living allowance fraud. That the investigation was "ongoing" might imply others besides Plaintiff were suspected of fraud, but it

10

would not suggest Plaintiff's termination was for any reason other than fraud. It would make no sense for an employer to fire an employee because of an "ongoing investigation" into wrongful activity if the employer did not believe the employee had engaged in the activity. Any reasonable employee facing such a termination would understand this; no reasonable juror would find otherwise.

Given Plaintiff's lengthy experience in the nuclear industry, he should have known Defendants would report the nature of his termination to those maintaining his security clearances, including TVA at whose facility he had been working. Plaintiff admittedly knew that if an employee working at a nuclear facility were to be fired for some type of fraud, "it would probably affect their clearance" (Plaintiff's Dep. p. 29). Since Plaintiff knew or should have known he was fired for fraud, by his own admission he should have known this would be reported and affect his clearance. Not only that, but when he began his employment with Defendants, he signed a form acknowledging Defendants would use PADS to share information about him with others in the nuclear industry, and expressly authorizing Defendants to release such information. It should therefore have been eminently foreseeable to Plaintiff at the time of his termination that Defendants would report the termination to others in the nuclear industry, including TVA.

By the time Defendant realized a "flag" had in fact been placed on his PADS security file, the foreseeable should have, and must have, become the obvious. Plaintiff admittedly understood the "flag" was a result of his termination by Defendants. To cause the "flag" to be placed, Defendants must necessarily have communicated *something*. Given the Court's earlier conclusion Plaintiff must have known he was terminated as a result of Defendants' judgment he had engaged in living allowance fraud – not simply as the judgment-free result of an "ongoing investigation" –

11

Plaintiff knew or should have known the *something* that was communicated was Defendant's belief he had engaged in living allowance fraud. It is immaterial whether Plaintiff knew the precise verbiage Defendants used to communicate the nature of his termination; indeed, even the November 20, 2009 letter which Plaintiff claims started the limitations period running does not disclose the precise verbiage Defendants used to disclose the nature of his termination to TVA.[9] Plaintiff knew or should have known he was terminated because Defendants believed he had engaged in fraud, knew termination for fraud would affect one's clearance, knew the "flag" was caused by his termination, and knew Defendants had caused the flag to be placed.[10] It is simply untenable to maintain, in the face of all this knowledge, that until he received the November 20, 2009 letter Plaintiff somehow remained ignorant of the fact Defendants had reported the nature of his termination.

In short, this case is not among "that limited class of libel cases which, because of the secretive or inherently undiscoverable nature of the publication, the plaintiff did not know, or with reasonable diligence could not have discovered, that he had been defamed." *Leedom*, 1997 WL 671918, at *7. The issuance of the allegedly-defamatory communication should have been foreseeable to Plaintiff as soon as he was told he was being fired because of an "ongoing

---

[9]For that matter, the letter does not mention Bechtel or Sun Technical at all, or reference any communication made by them to TVA. It simply states Plaintiff was not being issued an unescorted access authorization because he had provided false living allowance information to an employer in the past. From this letter Plaintiff is drawing the *inference* Defendants must have communicated the nature of his termination; however the same inference fairly arises simply from the fact that, as Plaintiff knew, there was a "flag" on his PADS file which was the result of his termination by Defendants – a termination which, as discussed above, Plaintiff must reasonably have known was due to Defendants' belief he engaged in living allowance fraud.

[10]Indeed, in his November 13, 2009 e-mail discussing the "flag" he accuses Bechtel is "ruining" him.

12

investigation" into living allowance fraud. Once he realized there was a "flag" on his PADS file caused by his termination, by any reasonable accounting Plaintiff must have known, or at least should have known, Defendants had reported the nature of his termination to relevant nuclear industry entities, including TVA.[11] If Plaintiff believed that reporting to have been untrue, he could have brought a defamation action at that time.

The Court finds that more than one year before filing this case Plaintiff knew, or with reasonable diligence could have discovered, he had been allegedly defamed. This is therefore not one of the exceptionally rare libel cases where Tennessee's discovery rule operates to toll the statute of limitations. Because the case is untimely brought, Defendants are entitled to summary judgment.

**IV.   CONCLUSION**

For the reasons stated above, the Court will **GRANT** Defendant's motions for summary Judgment (Court File Nos. 44 & 46), and will **DISMISS** the case.

**An Order shall enter.**

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

---

[11]Even charitably assuming he did not know this, he could have discovered it with reasonable diligence. Per the form Plaintiff signed upon beginning employment, at any time he could have seen the information about him in PADS simply by requesting it in writing from Bechtel.

13